SO ORDERED: July 09, 2008.



James K. Coachys
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ANDREA FAITH WEISSMAN, | ) | Case No. 05-31642-JKC-7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| ANDREA FAITH WEISSMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 06-50108 |
| | ) | |
| AMERICAN EDUCATION SERVICES, | ) | |
| SALLIE MAE SERVICING CORP. and | ) | |
| WELLS FARGO EDUCATIONAL | ) | |
| FINANCIAL SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter comes before the Court on Debtor Andrea Faith Weissman's ("Debtor") Complaint filed pursuant to 11 U.S.C. § 523(a)(8) to discharge various student loan obligations owed to the above-named Defendants. The Court conducted a

trial on January 10, 2008, on Debtor's Complaint as it relates to Sallie Mae Servicing Corporation ("Sallie Mae"). Plaintiff later filed a motion for a second hearing based on newly discovered evidence, and the Court conducted an additional hearing on May 22, 2008, after which it took the matter under advisement. Having considered the evidence and testimony presented, the Court now issues the following Findings of Fact and Conclusions of Law.

### **FINDINGS OF FACT**

1. Debtor is 41 years old. She is single and has no dependants. Until very recently, she has lived with her mother and father. Her father, who was retired, recently passed away, and her mother then moved to Florida. There was no evidence that, while living with her parents, Debtor paid rent or contributed anything to her parents' household expenses.

2. After her mother moved to Florida, Debtor lived with a friend. That accommodation is no longer available to her, and she is not certain where she will live.

3. Debtor testified that she has had cerebral palsy since birth. The Court received no medical evidence, testimonial or documentary, as to the nature of cerebral palsy, or how, if at all, it affects one's cognitive or physical abilities.

4. Debtor, herself, testified as to her own experience with cerebral palsy. Her gait is affected, but she is seemingly able to walk. Debtor said that she is limited as to how much weight she can lift.

5.     Debtor testified that she had a surgical procedure related to her cerebral palsy in 1998.  Since that surgery, Debtor has had difficulty running, riding a bike, and climbing stairs.

6.     This past spring, Debtor saw a physical therapist with the goal of being independent with a home exercise program for improving strength, gait and standing balance.

7.     Debtor testified that she also suffers from epilepsy, for which she takes medication.  She last had a seizure in 1988.  No medical records or testimony were given on the subject.  Debtor did not say how, if at all, she is affected by this condition.

8.     Debtor did not suggest, and there was no other evidence indicating, that Debtor's life expectancy is other than normal.

9.     Debtor's medical expenses are covered by Medicaid.

10.    Debtor works as a pharmacy technician in a Kroger pharmacy.  At the time of the January hearing, she testified that she worked only eight hours a week, because she was in school on a full-time basis.  Kroger pays Debtor $11.65 per hour.  From July of 2003 through August of 2004, Debtor worked forty hours a weeks as a pharmacy technician.  She left this job to go back to school.  From July of 2005 through February of 2006, Debtor again worked forty hours a week as a pharmacy technician.

11.    Debtor has been enrolled as a student for most of her adult life.  Debtor received an Associate of Arts degree in 1988 from Ocean County College, in Florida.  She then studied veterinary science for a semester at Rutgers University.  In 1992, Debtor received a Bachelor of Science degree in biology from Jacksonville University.  Debtor

then studied from 1993 to 1997 at Brevard Community College, taking courses prerequisite to pharmacy school.

12.     From 1996 to 2001, Debtor was enrolled in pharmacy school at Butler University in Indianapolis.  She withdrew from Butler when she was one semester shy of completing a degree.  Debtor states that she withdrew from the pharmacy program at Butler University because Butler would not accommodate her need for some sort of adaptive tool that would allow her to handle certain pharmaceutical implements in required courses.

13.     From 2004 through 2007, Debtor studied for a Masters degree in occupational therapy at Indiana University/Purdue University, Indianapolis ("IUPUI").  Debtor's tuition at IUPUI was paid by a program to which her father had access as a disabled veteran.  Debtor paid only for books.  Although her father is now deceased, Debtor still has access to these benefits.  However, in the period between the January and May hearings, she withdrew from the program.  She had one semester of coursework and a one-semester practicum left to complete her degree.  Debtor testified that she was "kicked out" of a training rotation related to mental health because the 40-hour per week schedule was fatiguing, which affected her performance.  Debtor then withdrew from the occupational therapy program, for two reasons:  First, Debtor foresaw some rotations in her practical training that would require physical activities she did not think she could complete.  Rather than risk receiving failing marks, she withdrew.  Second, Debtor indicated that she does not have enough money to continue going to school.

14. Debtor estimated that if she were hired as an occupational therapist, her entry level salary would be between $30,000 and $50,000 per year.

15. According to her tax returns, which the Court received in evidence, Debtor earned $17,356 in 2003, $21,235 in 2004, and $16,321 in 2005.

16. The subject of this adversary proceeding is a group of five student loans Debtor took to finance her education at Butler. The first of the five loans was made November 20, 1998, and the last was made on August 30, 2001.

17. Debtor applied for forbearance terms with Sallie Mae on four occasions. The first occasion covered June 25, 2001 to August 3, 2001. The second application covered December 17, 2001 to June 3, 2002. The third application was made on July 9, 2002, and the fourth was made on September 14, 2002.

18. Then, on April 4, 2004, Debtor applied for a graduated repayment plan with Sallie Mae, whereby she would make only interest payments for the first four years of the program. Over the next fourteen months, Debtor made monthly interest payments ranging from $205.38 to $388.75, apparently depending on the variable rate of interest. According to Plaintiff's Exhibit 1, which is the only record or evidence of any payments made by Debtor on the Sallie Mae loans, Debtor's fourteen payments totaled $4,053.64, and left her with a balance as of June 24, 2005 of $63,281.28. Debtor's last payment was May 31, 2005.

19. Defendant Wells Fargo Educational Financial Services never answered Debtor's Complaint and was eventually defaulted. Debtor negotiated a settlement with Defendant American Education Services and Intervenor Educational Credit Management

Corporation. Per the Settlement, Debtor is now in the "Ford Program" and her repayment obligations are income dependent. To date, she has not been required to make any payments under that program.

20. Debtor's non-student loan scheduled debt amounted to less than $6,000 in unsecured non-priority claims and the balance on a car lease that Debtor reaffirmed at $234 per month.

21. Debtor stated that the long-term effects of the cerebral palsy put at issue her ability to generate the income necessary to pay the student loan obligations at issue here. However, no medical evidence was presented to prove that Debtor is totally, or even partially, disabled.

22. Debtor applied for a total disability determination with the Social Security Administration, but was denied. Debtor believes she appealed that decision, and lost.

## CONCLUSIONS OF LAW

1. Debtor asks that the Court discharge the balance of the her indebtedness to Sallie Mae pursuant to 11 U.S.C. § 523(a)(8)'s concept of "undue hardship."

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. According to the Seventh Circuit, "undue hardship" requires a three-part showing (1) that the debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loan; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and (3) that the

debtor has made good faith efforts to repay the loan. *In the Matter of Roberson,* 999 F.2d 1127, 1135 (7th Cir.1993) (adopting the test set forth in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395)(2d Cir. 1987)).

      4.      The debtor has the burden of establishing each element of the test by a preponderance of the evidence.

      5.      The first prong of *Brunner* requires an examination of the debtor's current financial condition to see if payment of the loans would cause her standard of living to fall below that minimally necessary. Bankruptcy courts have routinely applied this requirement as the bare minimum to assert a claim of "undue hardship" warranting discharge of student loans. *Id.* at 1135 (citing *In re Ipsen*, 149 B.R. 583, 585-86 (Bankr.W.D.Mo.1992)). Student loans "should not as a matter of policy be dischargeable before [the debtor] has demonstrated that for any reason he is unable to earn sufficient income to maintain himself and his dependents and to repay the educational debt." *Id.* (citations omitted). In light of the heightened standard for dischargeability of student loans, an examination into the debtor's ability to maintain a minimal standard of living comports with common sense. *Id.* (citing *Brunner*, 31 F.2d at 396). This test should serve as the starting point for the § 523(a)(8)(B) inquiry since information regarding the debtor's current financial situation generally will be concrete and readily obtainable.

      6.      The second prong of *Brunner* properly recognizes the potential continuing benefit of an education, and imputes to the meaning of "undue hardship" a requirement that the debtor establish that his or her dire financial condition is likely to exist for a significant portion of the repayment period.

7.      Upon the debtor's satisfaction of the first two requirements for discharge, the court should examine the third prong of the *Brunner* test–whether the debtor has made a good faith effort to repay his or her loans.

8.      At her *current* income, Debtor appears to be unable to repay her student loans while still maintaining a minimal standard of living. Thus, she has met the first prong of the *Brunner* test. Debtor, however, has not met the second prong of *Brunner* in that she has not shown that her "dire financial situation" will continue for a significant portion of the repayment period. Now that she is no longer attending school, Debtor should be able to obtain and maintain full-time employment. She has been employed full-time as a pharmacy technician–a position that pays twice the federal minimum wage–in the recent past. All but a small portion of her indebtedness has been discharged pursuant to this bankruptcy, repayment of her other student loan obligations is income dependent, and her medical expenses are paid by Medicaid. Her remaining expenses are relatively low.

9.      While Debtor suffers from cerebral palsy, it does not appear to render her incapable of working on a full-time basis. There is also no evidence to suggest that her condition is worsening.

10.     This set of circumstances is clearly not the "certainty of hopelessness," *Roberson* requires to satisfy the second prong. *Roberson*, 999 F.2d at 1136. Debtor cannot remain underemployed in an effort to discharge her student loans. *Farrish v. U.S. Dep't of Educ. (In re Farrish),* 272 B.R. 456, 462 (Bankr.S.D.Miss.2001) (debtors are

expected to use their best efforts to maximize their income within their vocational profile).

11. Based on the foregoing, the Court concludes that Debtor has not satisfied the second prong of the *Brunner* test and that her indebtedness to Sallie May is, therefore, not dischargeable. As such, the Court need not examine whether Debtor has satisfied *Brunner's* third prong.

12. Notwithstanding Debtor's failure to establish dischargeability, Sallie Mae has consented to a partial discharge. Specifically, they have agreed to reduce the debt to $50,000, to establish a fixed rate of interest at 3%, to defer payment for three months, and to require payments of $277.30 per month for twenty years thereafter.

13. The Court will issue a Judgment consistent with these Findings of Fact and Conclusions of Law and that reflects Sallie Mae's voluntary compromise.

###

Distribution:

Jeffrey B. Jackson
Daniel G. McNamara
UST